IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MOUNTAIN HOME LUMBER COMPANY,
LLC, d/b/a MARCHANT INSTALLS;
AND US GREENFIBER, LLC                                    PLAINTIFFS

          v.              Civil No. 04-5161

INDIANA LUMBERMENS MUTUAL
INSURANCE COMPANY                                          DEFENDANT

## J U D G M E N T

Now on this 18th day of August, 2005, comes on for consideration the captioned matter, same being submitted on a stipulation of facts for decision by the Court without a trial, and from the submissions of the parties, the Court finds and orders as follows:

1. In this diversity case, plaintiffs pray for a declaratory judgment that defendant Indiana Lumbermens Mutual Insurance Company (**"Lumbermens"**) is liable on a policy of insurance issued to plaintiff Mountain Home Lumber Company, LLC, d/b/a Marchant Installs (**"Marchant"**) for any damages recovered against **Marchant** by plaintiff US Greenfiber, LLC, (**"USGF"**) in a separate action between **Marchant** and **USGF**. **Lumbermens**, for its part, counterclaims for a declaratory judgment that it is not so liable.

### Findings of Fact

2. In 2002, Robert and Lori Bowker (the **"Bowkers"**) contracted with Nicolet Brothers, Inc. (**"Nicolet"**) to build the

**Bowkers** a house on Lot 5, Harbor Point Subdivision, in Baxter County, Arkansas.

3. **Nicolet**, in turn, contracted with **Marchant** to provide and install cellulose insulation in the house. **Marchant** is engaged in the business of providing and installing insulation.

4. Pursuant to the contract with **Nicolet**, **Marchant** installed cellulose insulation manufactured and sold to it by **USGF**. The insulation was installed by a process whereby cellulose materials were mixed with water and then sprayed into position. After spraying, the insulated areas were sealed off by the construction of interior walls and ceilings.

5. At some point after the insulation was installed, it was discovered that mold was growing on the insulation in a number of locations. The **Bowkers** complained to both **Marchant** and **USGF** about the mold, and ultimately employed an attorney to pursue a claim for damages caused by this mold.

6. By letter dated March 14, 2003, the **Bowkers'** attorney made demand upon **USGF** for damages. The **Bowkers** eventually settled with **USGF**. The settlement concluded the **Bowkers'** claims against not only **USGF**, but also **Marchant**, and included an assignment of the **Bowkers'** claims against **Marchant** to **USGF**.

7. Following the execution of the settlement documents, **USGF** sought to recover its payment to the **Bowkers** by a suit filed

against **Marchant** and **Nicolet** in the United States District Court for the Western District of Arkansas (case number 03-5135, Honorable Robert T. Dawson presiding)("the Contribution Suit"). The Contribution Suit asserted a claim for contribution under the Arkansas Contribution Among Tort Feasors Act, **A.C.A. §16-61-201 et seq.**, against **Marchant; Mountain Home Lumber, LLC d/b/a Marchant Building Center**; and **Nicolet.** It also asserted the **Bowkers'** breach of contract claim against **Nicolet.**

8. At all relevant times, **Marchant** was insured under Policy No. APP 19064744 03 ("the Policy"), issued by **Lumbermens.** The parties stipulate that the copy of the Policy attached to the Complaint is a true copy, including all endorsements, attachments, and amendments thereto.[1]

9. **Lumbermens** accepted defense of **Marchant** in the Contribution Suit, without any reservation of rights as to questions of coverage. During the pendency of the Contribution Suit, however, **Lumbermens** elected to deny coverage, and so notified **Marchant** by letter dated March 1, 2004.

10. Following **Lumbermens'** denial of coverage, the parties to the Contribution Suit jointly requested administrative termination

---

[1]Lumbermens contends in its brief that the Policy attached to the Complaint is not complete, inasmuch as the Commercial Property Coverage Part and the Commercial Crime Coverage Part of the Policy are not included, and this appears to be the case, but there is no claim that the missing parts are relevant to the issues before the Court, and the Court finds that it has a sufficiently complete copy of the Policy to resolve the issues before it.

of that case, in order to seek a judicial resolution of the coverage issues with **Lumbermens**. The Contribution Suit was administratively terminated on June 4, 2004, and this action was filed on July 7, 2004.

11. The components of the Policy relevant to the issues herein presented include declarations pages, coverage parts, and endorsements.

12. There are three coverage parts in the Policy:

* the Commercial Property Coverage Part;

* the Commercial Crime Coverage Part; and

* the Commercial General Liability Coverage Part.

The **Commercial General Liability Coverage Part** -- with which this case is concerned -- includes both a **Commercial General Liability Coverage Form** and a **Products/Completed Operations Liability Coverage Form**.

13. The Policy includes both Common Policy Declarations, and declarations specific to the **Commercial General Liability Coverage Part**.[2]

14. There are multiple endorsements (sometimes called "amendments") to the Policy, and each endorsement specifies what is modified thereby, in a phrase beginning "[t]his endorsement

---

[2]It is to be expected that specific declarations for the other coverage parts are included in the overall Policy as well, but like the coverage parts to which they would apply, these specific declarations do not appear in the Policy attached to the Complaint.

modifies insurance provided under the following," which is then followed by a listing of that which is modified.

Those listings, in the various endorsements, differentiate between the **Commercial General Liability Coverage Part** and what is referred to as a "Products/Completed Operations Liability Coverage Part." They do not use the term "**Products/Completed Operations Liability Coverage Form**."

15. The particular endorsement relevant to the dispute before the Court -- the "Fungi Or Bacteria Exclusion" (the "**Exclusion**") -- states that it "modifies insurance provided under the following: COMMERCIAL GENERAL LIABILITY COVERAGE PART."

16. The relevant language of the **Products/Completed Operations Liability Coverage Form** is as follows:

SECTION I - COVERAGES
PRODUCTS/COMPLETED OPERATIONS
BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" included within the products-completed operations hazard" to which this insurance applies.

\*      \*      \*

2. Exclusions.

h. Damage to your Product. "Property damage" to "your product" arising out of it or any part of it.

i. Damage to Your Work. "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

<pre>            *     *     *
SECTION V - DEFINITIONS
</pre>

12.  "Products-completed operations hazard" . . . [i]ncludes all "bodily injury" and "property damage occurring away from premises you own or rent and arising out of "your product" or "your work" . . . .

13.  "Property damage" means . . . a.  Physical injury to tangible property, including all resulting loss of use of that property. . . . b.  Loss of use of tangible property that is not physically injured. . . .

16.  "Your product" . . . [m]eans . . . [a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . [y]ou. . . .

17.  "Your work" . . . [m]eans . . . [w]ork or operations performed by you or on your behalf; and . . . [m]aterials, parts or equipment furnished in connection with such work or operations.

17.  The Declarations page of the **Commercial General Liability Coverage Part** establishes two separate aggregate limits of liability:

*  one is identified as the **"General Aggregate Limit (Other Than Products-Completed Operations);"**

*  the other is identified as the **"Products-Completed Operations Aggregate Limit."**

These limits correspond to the two "coverage forms" included in the **Commercial General Liability Coverage Part** of the Policy, the **"Commercial General Liability Coverage Form"** and the **"Products/Completed Operations Liability Coverage Form."**

18.  The **Bowkers** claim that remediation of the mold

contamination in their house required removal of the interior walls and ceilings; removal of the insulation; removal and cleaning of the appliances, fixtures, heating and air conditioning ducts, and cabinetry; disinfection of the surfaces where insulation had been installed; and replacement of the interior walls, ceilings, fixtures, appliances, cabinetry, heating and air conditioning ducts.  During the time these operations were being carried out, the **Bowkers** could not live in the house.

## Conclusions of Law

19.  The basis for jurisdiction in this case is diversity of citizenship.  In resolving substantive issues the Court is, therefore, bound by the decisions of the Arkansas Supreme Court. **Bockelman v. MCI Worldcom, Inc.**, **403 F.3d 528 (8th Cir. 2005).**

20.  Plaintiffs take the position that, to the extent **USGF** prevails against **Marchant** in the Contribution Suit, the Policy affords coverage for the costs of remediation of the **Bowkers'** residence under the **Products/Completed Operations Liability Coverage Form.**

**Lumbermens** takes the position that all such costs, being proximately caused by mold, are excluded from coverage by the **Exclusion.**  Alternatively, **Lumbermens** claims that some of the asserted costs do not come within the terms of the Policy.

21.  The **Products/Completed Operations Liability Coverage Form** covers "those sums that the insured becomes legally obligated

-7-

to pay as damages because of 'bodily injury' or 'property damage' included within the 'products-completed operations hazard' to which this insurance applies."

The "products-completed operations hazard" refers to property damage occurring away from premises owned or rented by the insured and arising out of the insured's "product" or "work."  The insured, **Marchant,** did not own or rent the **Bowker** residence and was installing insulation sold, handled and distributed by it in that residence.  Thus the installation of the insulation falls within the plain language of the Policy's definitions of "your product" and "your work."  Policy language is to be construed in its plain, ordinary and popular sense.  <u>**Smith v. Southern Farm Bureau Casualty Insurance Co.,**</u> **353 Ark. 188, 114 S.W.3d 205 (2003).** The Court concludes that -- to the extent it caused the alleged property damage -- **Marchant**'s work at the **Bowker** house falls within the definition of the "products-completed operations hazard" in the **Products/Completed Operations Liability Coverage Form.**

22.  There are certain exclusions in the **Products/Completed Operations Liability Coverage Form.**  That form excludes "'property damage' to 'your product' arising out of it or any part of it," and "'property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."

-8-

In the Court's view, the cellulose insulation fits plainly within the definition of **Marchant's** "product," and its installation fits plainly within the definition of **Marchant's** "work." The Court, therefore, concludes that any damage to the cellulose insulation itself is excluded from coverage under the **Products/Completed Operations Liability Coverage Form**.

Nevertheless, since plaintiffs do not contend that they are entitled to any coverage for damage to the cellulose insulation -- but only for damages to other parts of the structure caused by faulty installation of the insulation -- the applicability of this exclusion is of no import.

23. **Lumbermens** contends that more than just Marchant's "work" and its "product" are excluded from coverage under the **Products/Completed Operations Liability Coverage Form** -- it argues that plaintiffs' claims are completely barred by the **Exclusion. Lumbermens** reasons as follows:

* first, that the **Exclusion** applies to all insurance provided under the **Commercial General Liability Coverage Part**;

* second, that the **Commercial General Liability Coverage Part** includes the **Products/Completed Operations Liability Coverage Form** (or -- alternatively -- that the **Products/Completed Operations Liability Coverage Form** is

"nothing more than a restatement" of the coverage in the **Commercial General Liability Coverage Form**"); and

\*        third, that the **Exclusion** must, therefore, apply to the **Products/Completed Operations Liability Coverage Form**.

Since plaintiffs assert their claims under the **Products/Completed Operation Liability Coverage Form, Lumbermens** contends that the **Exclusion** bars those claims entirely.

**Lumbermens** has the burden of proof on this issue. "Any intent to exclude coverage should be expressed in clear and unambiguous language and the burden is upon the insurance company to present facts that come within the exception." **State Farm Mutual Auto Insurance Co. v. Baker**, 239 Ark. 298, 388 S.W.2d 920 (1965).

24.        The Court is not persuaded by **Lumbermens'** first line of reasoning – that the **Exclusion** applies to all insurance provided under the **Commercial General Liability Coverage Part**, and therefore applies to the **Products/Completed Operation Liability Coverage Form** because that form is included in the **Commercial General Liability Coverage Part**.

Starting with **Lumbermens'** first premise, the Court believes it could be concluded that the **Exclusion** applies to all insurance provided under the **Commercial General Liability Coverage Part** only by interpreting an ambiguity in favor of **Lumbermens.**  Such an interpretation is not permitted under Arkansas law.  If there is

a reasonable construction which favors the insured, the Court must adopt it:

> An insurance policy is to be construed strictly against the insurer, who chooses its language. . . . [P]rovisions contained in a policy of insurance must be construed most strongly against the insurance company which prepared it, and if a reasonable construction may be given to the contract which would justify recovery, it would be the duty of the Court to so do. . . . [I]f the language employed is ambiguous, or there is doubt or uncertainty as to its meaning and it is fairly susceptible of two interpretations, one favorable to the insured and the other favorable to the insurer, the former will be adopted.

**U.S. Fidelity & Guaranty Co. v. Continental Casualty Co.**, **353 Ark. 834, 120 S.W.3d 556 (2003)** (internal citations omitted).

The ambiguity in question becomes apparent from a four-corners reading of the Policy, which contains thirteen endorsements applicable to less than the entire Policy. Each of the thirteen endorsements indicates that it modifies insurance "provided under" one or more stated portions of the Policy.

Four of those endorsements are said to modify insurance provided under the "Products/Completed Operations Liability Coverage Part." In fact, the Policy contains no "Products/Completed Operations Liability Part." However, the policy does contain a **Products/Completed Operations Liability Form**. It follows that if those four endorsements are to apply to a portion of the Policy designated **"Products/Completed Operations Liability,"** such application must be to a *form* -- not a *part*.

-11-

In light of the foregoing, it appears to the Court that the words "part" and "form" are of questionable or ambiguous meaning in the endorsements. If they are not read as being used interchangeably, there is nothing in the Policy to which the four endorsements said to apply to the "Products/Completed Operations Liability Part" could apply. Such "indistinctness or uncertainty of meaning of an expression used in a written instrument" creates an ambiguity. **Smith v. Smith, 229 Ark. 579, 317 S.W.2d 275 (1958).**

This ambiguity must be resolved, if possible, in such a way as to make the endorsements applicable to some provision in the Policy. Otherwise, they would be rendered nugatory. An insurance contract should not be interpreted in such a way that portions of it are rendered nugatory. The Arkansas Supreme Court has said

> We have established as a guideline of contract interpretation that the different clauses of a contract should be construed so that all parts harmonize. Construction that neutralizes any provision of a contract should never be adopted if the contract can be construed to give effect to all provisions.

**Smith v. Southern Farm Bureau Casualty Insurance Co., 353 Ark. 188, 114 S.W.3d 205 (2003)** (internal citations omitted).

In attempting to resolve this ambiguity, the Court observes that the portions of the **Commercial General Liability Coverage Part** to which the **Exclusion** must be added are not to be found in the **Products/Completed Operations Liability Form**. There is no

-12-

"Section I - Coverage A" or "Section I - Coverage B" in that form.

Those sections do, however, appear in the **Commercial General Liability Coverage Form**. Thus, it would be impossible for the **Exclusion** to be imported into the **Products/Completed Operation Liability Coverage Form**, but not impossible for it to be imported into the **Commercial General Liability Coverage Form**.

From the foregoing, the Court concludes that **Lumbermens** has used the terms "part" and "form" interchangeably in designating the applicability of the various endorsements.

It further concludes that the statement that the **Exclusion** "modifies insurance provided under the . . . COMMERCIAL GENERAL LIABILITY COVERAGE PART" must be interpreted to mean that the **Exclusion** modifies insurance provided under the **Commercial General Liability Coverage Form**. This follows because the word "part" is reasonably susceptible to interpretation as the word "form" where it is used in these endorsements, and that interpretation places the **Exclusion** into the only portion of the Policy where it "fits" the language it is supposed to follow -- the **Commercial General Liability Coverage Form**. Further, such a reading or construction resolves the ambiguity in the **Exclusion** in a manner favorable to the insured.

25. The Court is likewise not persuaded by **Lumbermens'** alternative line of reasoning -- that the **Products/Completed**

**Operations Liability Coverage Form** provides identical coverage to that in the **Commercial General Liability Coverage Form** (and thus, that anything excluded in one is excluded in the other).

**Lumbermens** argues that:

> [t]he products/completed operations liability coverage form is nothing more than a restatement of the bodily injury and property damage liability coverage set out in the commercial general liability coverage form. A careful comparison of the coverages demonstrates that the products/completed operations coverage is identical in all important respects to the bodily injury and property damage coverage in the commercial general liability coverage form.

As stated in **Fowler v. Unionaid Life Insurance Co., 180 Ark. 140, 20 S.W.2d 611 (1929),** "[e]very word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument."

The Court rejects the notion that an insurer would write a ten-page coverage form into a policy if it were nothing more than a restatement of coverage granted in another part of the policy. To do so would be to treat that entire coverage form as "mere surplusage."

The Court likewise does not believe that an insurer would establish separate aggregate limits of liability for the two coverage forms if they were the same -- or if one were but a subpart of the other. The Declarations page for the **Commercial**

**General Liability Coverage Part** does establish separate aggregate limits of liability for the two coverage forms here under consideration: the **"General Aggregate Limit (Other Than Products-Completed Operations)"** and the **"Products/Completed Operations Aggregate Limit."**

In light of the foregoing, the Court finds that the **Products/Completed Operations Liability Coverage Form** is a separate coverage, not duplicative of the **Commercial General Liability Coverage Form**.

26. For the foregoing reasons, the Court rejects **Lumbermens'** attempt to read the **Exclusion** into the **Products/Completed Operations Liability Coverage Form**. The Court believes that the **Exclusion** applies only to the **Commercial General Liability Coverage Form**, and thus does not exclude the damages to the **Bowker** house which are claimed under the **Products/Completed Operations Liability Coverage Form**.

27. Having found that damages to the **Bowker** house are covered under the **Products/Completed Operations Liability Coverage Form** (except for damage to the insulation itself, which is excluded from that coverage), it remains to be determined what those damages are.

While the parties have offered some evidence as to kinds and amounts of damage, the Court believes it would be premature to

apportion that damage to **Marchant.**

It appears that the issues in the Contribution Suit are:

(a) what, if any, is the relative fault of the named defendants (**Marchant; Mountain Home Lumber, LLC, dba Marchant Building Center; and Nicolet**) for any particular item of damage? and

(b) what is the dollar value of any such item of damage?

The Court believes that the issues presented in this case are adequately resolved simply by stating that the Policy covers all costs reasonably associated with remediation of the mold problem, as well as loss of use of the residence for the period of time required to accomplish the remediation. It does not cover the cost of the cellulose insulation or the installation thereof, those being excluded as the "work" and the "product" of **Marchant.**

28. The parties also dispute whether attorney's fees paid by the **Bowkers** to their attorney in reaching the settlement agreement with **USGF** are covered under the Policy. Plaintiffs contend that the Policy covers those fees because the **Bowkers** "would have been entitled to recover" attorney fees in a breach of warranty action, which would have been a viable claim against **Marchant** because the cellulose insulation is a consumer product as defined by **15 U.S.C. §2301(1).** **Lumbermens** argues that the fees are not covered "in part because they were not paid as the result of any award of damages."

The Court does not agree with either of these propositions. Proper analysis of the issue must begin with the terms of the Policy, which provides that **Lumbermens** "will pay those sums that [**Marchant**] becomes legally obligated to pay as damages because of . . . 'property damage' included within the 'products-completed operations hazard' to which this insurance applies."

**Marchant** will become "legally obligated" to pay monies as a result of the **Bowker** mold problem, if at all, only by virtue of the Contribution Suit. In that suit, **USGF** asserted the breach of contract claim assigned to it by the **Bowkers** against **Nicolet**, but it asserted only a claim for contribution pursuant to the Arkansas Contribution Among Tort Feasors Act, **A.C.A. §16-61-201 et seq.**, against **Marchant.** In order to come within the terms of that Act, **USGF** and **Marchant** must be joint tortfeasors, i.e., "jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all of some of them." **A.C.A. §16-61-201.**

Under Arkansas law, attorney's fees are not recoverable in an action sounding in tort. **Brown v. Blake**, **86 Ark. App. 107, 161 S.W.3d 298 (2004).** The Court therefore concludes that attorney's fees paid by the **Bowkers** to their attorney in reaching the settlement agreement with **USGF** are not covered under the Policy.

**IT IS THEREFORE DECLARED** that Indiana Lumbermens Mutual

Insurance Company Policy No. APP 19064744 03 affords coverage -- up to the aggregate limits of the **Products/Completed Operations Liability Coverage Form** -- for all sums **Mountain Home Lumber Company, LLC, d/b/a Marchant Installs**, becomes legally obligated to pay as a result of damages to the house owned by **Robert and Lori Bowker** on Lot 5, Harbor Point Subdivision, in Baxter County, Arkansas, which were proximately caused by the installation of cellulose insulation in that house by **Marchant Installs**, including the costs of removing the cellulose insulation; remediating any damages caused thereby; returning the house to the condition it would have been in if the insulation had not developed mold; and loss of use of the house as a residence for the period of time required to carry out the remediation.

 **IT IS FURTHER DECLARED** that Indiana Lumbermens Mutual Insurance Company Policy No. APP 19064744 03 does not afford coverage for the initial cost of installing cellulose insulation in the house owned by **Robert and Lori Bowker** on Lot 5, Harbor Point Subdivision, in Baxter County, Arkansas.

 **IT IS FURTHER ORDERED** that Indiana Lumbermens Mutual Insurance Company Policy No. APP 19064744 03 does not afford coverage for attorney's fees incurred by **Robert and Lori Bowker** in connection with their claims related to the insulation installed in their house located on Lot 5, Harbor Point Subdivision, in Baxter County, Arkansas.

IT IS SO ORDERED.

　　/s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**